SIDLEY AUSTIN LLP
Andrew W. Stern
Martin B. Jackson
Marissa Alter-Nelson
787 Seventh Avenue
New York, New York  10019
Tel: (212) 839-5300
Fax: (212) 839-5599

*Attorneys for Plaintiff Wells Fargo Bank, N.A.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
WELLS FARGO BANK, N.A.,                          :
                                                 :
                         Plaintiff,              :        No. 09-CV-854 (JSR)
                                                 :
- against -                                      :
                                                 :
                                                 :
TIMOTHY L. SHARMA,                               :
                                                 :
                         Defendant.              :
                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X


**MEMORANDUM OF LAW OF PLAINTIFF WELLS FARGO BANK, N.A.**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

ARGUMENT ....................................................................................................................... 7

I.     WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON
       SHARMA'S NEGLIGENT MISREPRESENTATION AND FRAUD
       COUNTERCLAIMS BECAUSE SHARMA CANNOT ESTABLISH
       THE REQUIRED ELEMENTS OF REASONABLE RELIANCE AND
       CAUSATION ...................................................................................................... 8

       A.     Sharma Cannot Establish that He Justifiably Relied Upon any of
              the Alleged Representations ...................................................................... 9

       B.     Sharma Cannot Establish that the Purported Misrepresentations
              Were the Proximate Cause of His Harm.................................................. 17

II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON SHARMA'S
       GOOD FAITH AND FAIR DEALING CLAIM.................................................... 19

       A.     Sharma's Banking Relationship With Wells Fargo Did Not Give
              Rise To a Special Relationship ................................................................. 20

       B.     Sharma's Subjective "Trust" in Wells Fargo Did Not Create a
              Special Relationship.................................................................................. 22

       C.     The Parties' Bargaining Power Was Not Sufficiently Unequal to
              Create a Special Relationship ................................................................... 23

III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON WELLS
       FARGO'S DECLARATORY JUDGMENT CLAIM .......................................... 24

CONCLUSION.................................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

### FEDERAL CASES

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)............................................................................7

*Brittan Committee International Corp. v. SW Bell Telegraph Co.*,
    313 F.3d 899 ................................................................................9

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)............................................................................7

*Continental Casualty Co. v. Coastal Savings Bank*,
    977 F.2d 734 (2d Cir. 1992)...............................................................24

*Dunkin' Donuts Inc. v. Barr Donut, LLC*,
    242 F. Supp. 2d 296 (S.D.N.Y. 2003)..............................................25

*Goetz v. Crosson*,
    41 F.3d 800 (2d Cir. 1994)...............................................................7

*K3C Inc. v. Bank of America*,
    204 Fed. Appx. 455, 460-61 (5th Cir. 2006) ...................................23

*Knight v. United States Fire Insurance Co.*,
    804 F.2d 9 (2d Cir. 1986) ................................................................8

*Krock v. Lipsay*,
    97 F.3d 640 (2d Cir. 1996)...............................................................9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................8

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) .........................................................9, 17

*Sergeant Oil & Gas Co., Inc. v. National Maintenance & Repair, Inc.*,
    861 F. Supp. 1351 (S.D. Tex. 1994) ..............................................16

*Tops Markets, Inc. v. Quality Markets, Inc.*,
    142 F.3d 90 (2d Cir. 1998)...............................................................7

*Westcap Enterprises v. City Colleges of Chicago*,
    230 F.3d 717 (5th Cir. 2000) .....................................................15-16

## STATE CASES

*Airborne Freight Corp. v. C.R. Lee Enterprises, Inc.*,
　　847 S.W.2d 289 (Tex. App. 1992)................................................................................15

*Arnold v. National County Mutual Fire Insurance Co.*,
　　725 S.W.2d 165 (Tex. 1987).....................................................................................21

*Arthur Andersen & Co. v. Perry Equip. Corp.*,
　　945 S.W.2d 812 (Tex. 1997)................................................................................ 17-18

*Bank One, Texas, N.A. v. Stewart*,
　　967 S.W.2d 419 (Tex. App. 1998).......................................................................... 23-24

*Beebe v. Compaq Computer Corp.*,
　　940 S.W.2d 304 (Tex. App. 1997)............................................................................11

*Biosilk Spa, L.P. v. HG Shopping Centers, L.P.*,
　　No. 14-06-00986-CV, 2008 WL. 1991738 (Tex. App. May 8, 2008).............................12

*Bower v. Sheraton Overseas Mgmt. Corp.*,
　　No. 07 Civ. 2348(LAP), 2009 WL. 734021 (S.D.N.Y. March 19, 2009) ..........................9

*Columbia Medical Ctr. v. Hogue*,
　　271 S.W.3d 238 (Tex. 2008)....................................................................................17

*Crim Truck & Tractor Co. v. Navistar International Transport Corp.*,
　　823 S.W.2d 591 (Tex. 1992),
　　*superseded by statute on other grounds as stated in*
　　*Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212 (Tex. 2002)............22

*D/FW Wheatland Investment, L.P. v. Lehman Brothers Holdings, Inc.*,
　　No. 3-00-CV-2120-BD, 2001 WL. 1445950 (N.D. Tex. Nov. 13, 2001) ........................21

*DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*,
　　112 S.W.3d 854 (Tex. App. 2003)....................................................................12, 14, 19

*DeClaire v. G&B McIntosh Family Ltd. P'Ship*,
　　260 S.W.3d 34 (Tex. App. 2008)...............................................................................13

*Duperier v. Texas State Bank*,
　　28 S.W.3d 740 (Tex. App. 2000)...............................................................................16

*Employees Retirement System of Tex. v. Putnam, LLC*,
　　No. 03-08-00473-CV, 2009 WL. 2059425 (Tex. App. July 15, 2009) ................. 9, 18-19

*Ernst Young, LLP. v. Pac. Mut. Life Ins. Co.*,
  51 S.W.3d 573 (Tex. 2001)..............................................................................8

*FDIC v. Coleman*,
  795 S.W.2d 706 (Tex. 1990).................................................................... 20-21

*Fair Isaac Corp. v. Tex. Mutual Insurance Co.*,
  No. H-05-3007, 2006 WL. 2022894 (S.D. Tex. July 17, 2006) .......................15

*Farah v. Mafrige & Kormanik, P.C.*,
  927 S.W.2d 663 (Tex. App. 1996)..................................................................21

*Formosa Plastics Corp., USA v. Presidio Engineers and Contractors, Inc.*,
  960 S.W.2d 41 (Tex. 1998)............................................................................20

*Frazier  v. Frontier State Bank*,
  No. 04-98-00384-CV, 1999 WL. 125441 (Tex .App. March 10, 1999)...........22

*GTE Mobilnet of S. Tex. Ltd. Partnership v. Telecell Cellular, Inc.*,
  955 S.W.2d 286 (Tex. App. 1997)..................................................................21

*Harris Fiberglass Materials, Inc. v. Vought Aircraft Industrial*, No. 2-06-437-CV, 2007
  WL. 3317655 (Tex. App. Nov. 8, 2007).......................................................8-9

*Kalisch-Jarcho, Inc. v. City of N.Y.*,
  72 N.Y.2d 727 (1988)....................................................................................25

*Klein v. O'Quinn*,
  874 S.W.2d 776 (Tex. App. 1994)..................................................................21

*Larsen v. Carlene Langford & Associates*,
  41 S.W.3d 245 (Tex. App. 2001)....................................................................17

*Lovell v. Western National Life Insurance Co.*,
  754 S.W.2d 298 (Tex. App. 1988)..................................................................20

*Manges v. Astra Bar, Inc.*,
  596 S.W.2d 605 (Tex. App. 1980)..................................................................11

*Manufacturers Hanover Trust Co. v. Kingston Investors Corp.*,
  819 S.W.2d 607 (Tex. App. 1991)..................................................................21

*Miller v. Raytheon Aircraft Co.*,
  229 S.W.3d 358 (Tex. App. 2007)....................................................................8

*Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*,
  202 S.W.3d 250 (Tex. App. 2006)........................................................ 12, 14-15

*Transport Insurance Co. v. Faircloth*,
    898 S.W.2d 269 (Tex. 1995)...........................................................................15

*Vasquez v. Soto*,
    61 A.D.3d 968, 877 N.Y.S.2d 467 (2d Dept. 2009) ........................................9

*W&K Associates, Ltd. v. Mesa Operating Ltd. Partnership*,
    No. 07-96-0007-CV, 1996 WL 636487 (Tex. App. Nov. 4, 1996) ................22

*Wil-Roye Investment Co. II v. Washington Mutual Bank, N.A.*,
    142 S.W.3d 393 (Tex. App. 2004)..............................................................21, 23

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) ..................................................................................................1, 7

Plaintiff Wells Fargo Bank, N.A. ("Wells Fargo") respectfully submits this memorandum of law in support of its motion, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for dismissal of the fraud, negligent misrepresentation, and breach of good faith and fair dealing counterclaims asserted by  Defendant Timothy L. Sharma ("Sharma") in his First Amended Counterclaim (the "Counterclaim") and for summary judgment in the form of declaratory relief on Count One of its Complaint.

## PRELIMINARY STATEMENT

This is a classic case of buyer's remorse, in which, years after the transactions, the buyer seeks to disclaim the terms of a fully integrated agreement based upon alleged prior oral misrepresentations.  Because discovery has shown that Sharma is unable to sustain his burden on any of his defenses or counterclaims, and because Wells Fargo is entitled to a declaration that the subject contracts are valid and enforceable, summary judgment should be granted.

In April 2003, Defendant Sharma borrowed approximately $30 million from Wells Fargo to construct a medical office complex.  The construction loans were variable rate loans that floated with referenced market interest rates.  In reaction to rising interest rates in 2006 and 2007, which increased the cost of his variable rate loans, Sharma entered into an interest rate Swap Agreement (defined below) with Wells Fargo to hedge his interest rate risk, by effectively fixing his floating rate loans at 7.15 percent.  Due to the recent dramatic decline in interest rates, Sharma now wishes, in hindsight, that he had left his variable rate loans floating.

In order to avoid the consequences of his decision to enter into the Swap Agreement, which has eliminated savings that Sharma otherwise could have realized under his variable rate loans, Sharma has concocted a series of alleged misrepresentations that he claims entitle him to rescind the Swap Agreement.  The undisputed facts adduced in discovery, however, demonstrate that Sharma cannot, as a matter of law, establish a claim for fraud and negligent

misrepresentation because the alleged misrepresentations (i) were not actually relied upon by Sharma as a matter of undisputed fact; (ii) are contradicted by the express terms of the Swap Agreement; (iii) could not reasonably or justifiably have been relied upon by Sharma as a matter or law; and (iv) were not the proximate cause of Sharma's alleged harm. Moreover, Sharma's only remaining counterclaim, for breach of the duty of good faith and fair dealing, likewise fails because the undisputed facts establish that Sharma -- a savvy real estate investor with a net worth over $20 million, access to business and financial professionals, and advised by counsel regarding the Swap Agreement -- did not have a sufficiently "special relationship" with Wells Fargo, as is required to bring a good faith and fair dealing claim under Texas law.

Thus, as explained below, because Sharma cannot establish the required elements for his counterclaims, there is no need for a trial on the merits and the Court should grant summary judgment on Wells Fargo's claim for declaratory judgment and dismiss Sharma's counterclaim.

## STATEMENT OF FACTS[1]

Sharma is an experienced and "savvy" real estate developer with a net worth in excess of $20 million. (SoF at ¶¶ 2, 5.) Sharma conducts banking activities at three separate banks, and has access to and uses the services of several attorneys, a stockbroker, and his business staff, including a Certified Public Accountant with an MBA. (SoF at ¶¶ 9-13.) Notwithstanding Sharma's access to and use of financial and legal services providers, Sharma explained during his deposition that he is the "decision-maker" with respect to business decisions. (SoF at ¶ 67.)

Sharma first became a customer of Wells Fargo in or around 1996 when Wells Fargo

---

[1] The undisputed material facts entitling Wells Fargo to summary judgment are set forth in Wells Fargo's accompanying Statement of Undisputed Facts Pursuant to Rule 56.1 of the Local Rules for the United States District Courts for the Southern District of New York ("SoF"). The facts have been summarized here in order to provide a proper framework for the analysis that follows.

merged with First Interstate Bank.  (SoF at ¶ 14.)  Shortly thereafter, Charles Calvin ("Calvin")

became the Wells Fargo Relationship Manager for Sharma.  (SoF at ¶ 15.)  In or around April

2003, Sharma took out several variable interest rate loans from Wells Fargo totaling

approximately $30 million to finance various real estate ventures.  (SoF at ¶¶ 22-23, 26.)  The

loans were subject to a Construction Loan Agreement, which provided the following:

> The relationship of Borrower and Lender under the Loan Documents is, and shall
> at all times remain, solely that of borrower and lender, and Lender neither
> undertakes nor assumes any responsibility or duty to Borrower or to any third
> party with respect to the Property or Improvements, except as expressly provided
> in this Agreement and the other Loan Documents.
>
> * * *
>
>  (iii) [Sharma] is not in a significantly disparate bargaining position with respect
> to the subject transaction, and (iv) has been represented by independent legal
> counsel (who was not, directly or indirectly, identified, suggested or selected by
> lender or lender's agents) in connection with the referenced transaction.

(Jackson Decl. Ex. G at § 11.8, 11.28 (emphasis added); SoF at ¶¶ 23-25.)

Since entering into the variable interest rate loans in 2003, Sharma never met with any

Wells Fargo representatives for reasons unrelated to financial matters, other than Sharma's

attendance, along with other Wells Fargo customers at routine "customer-appreciation" events.

(SoF at ¶¶ 16-21.)  During these events, Sharma was not treated differently than any of the other

Wells Fargo banking customers that were present.  (SoF at ¶ 21.)

In 2006, the market interest rates upon which Sharma's loans were based rose

significantly and Sharma became concerned about rising interest rates.  (SoF at ¶¶ 28-29.)  As a

result, in February 2006, representatives from Wells Fargo made a presentation to Valinda

McAbee (Allen) ("McAbee") and Deo Shanker ("Shanker") -- individuals that worked with

Sharma and provided him with accounting services pursuant to a $18,000 per month consulting

contract -- concerning a potential swap agreement as an option for providing interest rate

protection on Sharma's floating rate loans.  (SoF at ¶¶ 30-31.)  Sharma knew that that the

presentation had been made to Shanker and McAbee.  (SoF at ¶ 34.)  After the February 2006 meeting, Wells Fargo representatives followed-up by sending a draft swap agreement and sought the opportunity to meet with Sharma directly to present him personally with additional information concerning options for interest rate protection.  (SoF at ¶ 32.)

In 2007, Sharma remained concerned about rising interest rates and fixing the rate on his floating interest rate loans.  (SoF at ¶ 36.)  On January 25, 2007, Calvin, Rosine Matthews (a Wells Fargo Branch Manager), and Brad Thompson (an employee in Wells Fargo's credit department), met with Sharma "to discuss the existing [loan] facilities and Dr. Sharma's concern over rising interest rates."  (SoF at ¶ 37.)  A follow-up meeting was scheduled with Sharma to discuss (i) amending the loan facility, (ii) the possibility of releasing more than $10 million worth of municipal bonds that secured one of Sharma's outstanding loans with Wells Fargo, and (iii) providing "swap and cap information for Dr. Sharma's review."  (SoF at ¶ 38.)

On February 1, 2007, Calvin, Matthews, and Thompson from Wells Fargo met with Sharma and Shanker to discuss ways to provide Sharma with interest rate protection on his loans.  (SoF at ¶¶ 39-42.)  During this meeting, Sharma was given a chart showing historical interest rates ("LIBOR") and information concerning various options for hedging Sharma's floating interest rate risk through a cap, a swap, or a combination of both.  (SoF at ¶¶ 43-46.)  Specifically, Sharma was informed that (1) a 8.50% cap on $16.5 million (or half) of his outstanding variable rate interest loans would cost $58,000; and (2) a 9% cap on $16.5 million of his outstanding variable rate interest loans would cost $45,000.   (SoF at ¶ 44.)  At the same time, Sharma was also informed that a "50/50 fixed floating approach can never lead you wrong— particularly when you have the cap in place to protect against a 'disaster' scenario."  (*Id.*)

Notwithstanding Wells Fargo's recommendation to purchase a cap or to enter into an interest rate swap on only a portion of his outstanding variable interest rate loans, Sharma

decided to enter into a swap agreement covering all of his outstanding variable interest rate loans, thereby avoiding all risk of higher interest rates on the entirety of his loans.  (SoF at ¶¶ 47-48.)  Thus, at the conclusion of the February 1, 2007 meeting, after discussions "between Dr. Sharma, Deo [Shanker] and the WF bankers," Sharma decided to enter into an interest rate swap agreement with Wells Fargo "to set the entire construction loan (securities, existing building and construction tranches) at 7.15% fixed rate of interest . . . effective 2/1/07."  (SoF at ¶¶ 48-49.)

Sharma has acknowledged that he is a "savvy business guy" who understands the difference between a fixed interest rate and a floating interest rate, and understands that "interest rates go up and they come down, they go up and they come down, and that there are cycles."  (SoF at ¶¶ 6, 50-51.)  However, after interest rates fell to unprecedentedly low levels at the beginning of this year, Sharma sought to avoid his obligations under the Swap Agreement by alleging that he relied upon the following purported misrepresentations made by Calvin:

 a. Neither [Calvin] nor the bank would profit from the interest rate swap.

 b. The bank has to go to the open market to purchase the swap.  The bank then gives it at no cost to you.  Neither the bank nor [Calvin] would make any money from the transaction.  We are doing this for your benefit.

 c. The bank does not own the swap operations.  That is a separate business owned by others and is traded on the open market.

 d. The swap could be unwound at any time without any charge to Dr. Sharma.

(Counterclaim at ¶ 5; SoF at ¶ 52.)

Although not set forth in the Counterclaim, Sharma also alleges that he relied on a statement that "interest rates could go up to 18 percent."  (SoF at ¶ 53.)  Notwithstanding these allegations, Sharma was clear during his deposition that he neither relied upon nor even considered whether Calvin or Wells Fargo was making money on the transaction and did not rely on any statements concerning whether the swap was traded on the open market.  (SoF at ¶¶ 54-

58.)  "[T]he real reason that [Sharma] entered into the swap agreement was that [he] believed it capped [his] interest rate at 7.15 percent and if interest rates fell that he would walk away at any time."  (SoF at ¶ 59.)  Sharma also testified that the <u>only</u> three reasons why he entered into the Swap Agreement were: (1) an alleged statement that "interest rates could go higher and could go as high as 18 percent," (2) an alleged statement that he "could pre pay it or dissolve the swap agreement at any point," and (3) that Sharma "trust[ed] the bank" and Calvin. (SoF at ¶ 60.)

On February 9, 2007, shortly after the February 1, 2007 meeting, Wells Fargo sent Sharma the draft Swap Agreement -- consisting of the ISDA Master Agreement and Schedule (together the "Swap Agreement") and four ISDA confirmations containing the specific details of each swap transaction (together the "Swap Transactions" or "Swap Transaction Confirmations"). (SoF at ¶ 61.)  After taking more than a week to review and seek advice on the agreements, Sharma signed and returned them to Wells Fargo.  (SoF at ¶ 62.)  The Swap Agreement included a "merger clause" that states:

> (a)  ***Entire Agreement***.  This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(SoF at ¶ 63.)

In the Swap Agreement, Sharma also acknowledged and agreed that he had read the risk disclosure, understood the risk disclosure, and had an opportunity to discuss any questions or comments that he had prior to signing the Swap Agreement.  (SoF at ¶ 64.)  The risk disclosure, which Sharma admitted was clear, provides, among other things, that "termination and/or modification may, in certain circumstances, result in significant losses to you" and "you should also understand that Wells Fargo is acting solely in the capacity of an arm's length contractual counterparty and not in the capacity of your financial advisor or fiduciary." (SoF at ¶¶ 64-66.)

In the Swap Agreement and the Swap Transaction Confirmations, Sharma also

represented that he was not relying on any oral or written communications from Wells Fargo as investment advice other than the representations expressly set forth in the Swap Agreement, had consulted with his own legal, regulatory, tax, business, investment financial and accounting advisors to the extent he deemed necessary and had made his own investment, hedging, and trading decisions based upon his own judgment and upon any advice from such advisors as he deemed necessary and not upon any view expressed by Wells Fargo.  (SoF at ¶¶ 68, 75.)  Sharma further acknowledged in the Swap Transaction Confirmations that he was "a sophisticated investor" and was "entering into this Transaction with a full understanding of all of the terms, conditions and risks thereof (economic and otherwise), and [was] capable of assuming and willing to assume (financially and otherwise) those risks."  (SoF at ¶ 75.)

Before signing the Swap Agreement and the Swap Transaction Confirmations, Sharma had the opportunity to consult with his attorneys, his business staff, his stockbroker, and with other financial institutions.  (SoF at ¶¶ 76-78.)  Moreover, Sharma did not sign the Swap Agreement or the Swap Transaction Confirmations until after his attorney, Mark Hodges, had reviewed the documents and "wordsmithed" them.  (SoF at ¶¶ 77, 79-86.)

## ARGUMENT

Summary judgment must be granted when "there is no genuine issue as to any material fact and  . . . the moving party is entitled to a judgment as a matter of law."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Goetz v. Crosson, 41 F.3d 800, 803 (2d Cir. 1994); Fed. R. Civ. P. 56(c).  To defeat the motion, the nonmovant may not rely on "[c]onclusory allegations, conjecture and speculation," but instead "must go beyond the pleadings to demonstrate the existence of some *specific facts* that create a genuine issue" of fact.  Tops Mkts., Inc. v. Quality Mkts, Inc., 142 F.3d 90, 95 (2d Cir. 1998) (emphasis added).  "Factual disputes that are irrelevant or unnecessary will not be counted."  Anderson v. Liberty Lobby, 477 U.S. 242, 248

(1986); Knight v. United States Fire Ins. Co., 804 F.2d 9, 11-12 (2d Cir. 1986) ("the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment").  Thus, if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial" and summary judgment should be granted.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

I.     **WELLS FARGO IS ENTITLED TO SUMMARY JUDGMENT ON SHARMA'S NEGLIGENT MISREPRESENTATION AND FRAUD COUNTERCLAIMS BECAUSE SHARMA CANNOT ESTABLISH THE REQUIRED ELEMENTS OF REASONABLE RELIANCE AND CAUSATION**

Sharma's first two counterclaims against Wells Fargo for common law fraud[2] and negligent misrepresentation [3] are based upon allegations that Sharma was fraudulently induced to enter into the Swap Agreement and the Swap Transactions.  (Counterclaim at ¶¶ 5, 7-12.) However, these claims fail as a matter of law because Sharma cannot establish, as required by both Texas and New York law, that (i) he justifiably relied on the alleged misrepresentation, or (ii) the alleged misrepresentation proximately caused his loss.  *See Harris Fiberglass Materials, Inc. v. Vought Aircraft Indus*, No. 2-06-437-CV, 2007 WL 3317655, at *2 (Tex. App. Nov. 8,

---

[2] The elements of fraud are: (1) a material representation that was false when made; (2) when the representation was made, the speaker knew it was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the speaker made the representation with the intent that the other party should act upon it; (4) the party actually and justifiably relied on the representation; and (5) thereby suffered injury.  *Miller v. Raytheon Aircraft Co.*, 229 S.W.3d 358, 380-81 (Tex. App. 2007) (emphasis added) (citing *Ernst Young, LLP. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001)).

[3] Similarly, the elements of a claim for negligent misrepresentation are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation."  *Jeffries v. Pat A. Madison, Inc.*, 269 S.W.3d 689, 691(Tex. App. 2008).

2007) (affirming summary judgment on fraud and negligent misrepresentation claims for lack of justifiable reliance); *Employees Ret. Sys. of Texas v. Putnam, LLC*, No. 03-08-00473-CV, 2009 WL 205425, at*4 (Tex. App. July 15, 2009) (affirming summary judgment on fraud and negligent misrepresentation claims and holding that "proximate cause is an essential element of [both claims]"); *Vasquez v. Soto*, 61 A.D.3d 968, 969, 877 N.Y.S.2d 467, 468 (2d Dept. 2009) (granting summary judgment and dismissing fraud and misrepresentation claims for lack of "reasonable or justifiable reliance"); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 89 -90 (2d Cir. 1994) (affirming summary judgment because "[t]he absence of adequate causation is . . . fatal to a common law fraud claim [and misrepresentation claim] under New York law.").[4]

**A.     Sharma Cannot Establish that He Justifiably Relied Upon any of the Alleged Representations**

Under Texas and New York law, negligent misrepresentation and fraud both require justifiable reliance.  *See Brittan Comm. Int'l Corp. v. SW Bell Tel. Co.*, 313 F.3d 899, 906 - 07(applying Texas law and affirming summary judgment dismissing fraud claim for lack of justifiable reliance); *Harris Fiberglass*, 2007 WL 3317655, at *2-3 (affirming summary judgment on fraud and negligent misrepresentation claims for lack of justifiable reliance); *Vasquez*, 61 A.D.3d 968 at 969, 877 N.Y.S.2d at 468 (same).  Here, the only representations upon which Sharma alleges he relied consist of the following statements he alleges were made by Calvin:

---

[4] For Sharma's fraud and negligent misrepresentation counterclaims, a choice of law analysis is unnecessary as the law of both states requires justifiable reliance and proximate causation.  For Sharma's good faith and fair dealing claim, however, there is a conflict between New York and Texas law.  Applying New York's choice-of-law jurisprudence, Texas law will apply to Sharma's good faith counterclaim because Texas is the location of the alleged tort.  *See Bower v. Sheraton Overseas Mgmt. Corp.*, No. 07 Civ. 2348(LAP), 2009 WL 734021, at *2 (S.D.N.Y. March 19, 2009) (citing *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996).

1.      "Neither [Calvin] nor the bank would profit from the interest rate swap."

2.      "The bank has to go to the open market to purchase the swap.  The bank then gives it at no cost to you.  Neither the bank nor [Calvin] would make any money from the transaction.  We are doing this for your benefit."

3.      "The bank does not own the swap operations.  That is a separate business - owned by others and is traded on the open market."

4.      "The swap could be unwound at any time without any charge to Dr. Sharma."

5.      "Interest rates could go up to 18 percent."[5]

(Counterclaim at ¶ 5; SoF at ¶¶ 52-53.)

Even assuming *arguendo* that these statements were actually made by Wells Fargo -- which Wells Fargo denies -- for the reasons discussed below they cannot support a claim for fraud or negligent misrepresentation because Sharma could not justifiably have relied upon them.

**1.      The first three alleged misrepresentations in the Counterclaim are immaterial and cannot support a claim for fraud or negligent misrepresentation because the undisputed facts show that Sharma did not rely on the representations, much less justifiably rely on them.**

During his deposition, Sharma made it clear that he did not actually rely upon the first three alleged misrepresentations included in the Counterclaim, which concern whether Wells Fargo and Charles Calvin were making money from the transaction, whether the bank owned the swap operations, and whether the swap was traded on the open market.  (SoF at ¶¶ 54-58.) Sharma testified that (i) he never even considered whether Charles Calvin was making any money (SoF at ¶ 55); and (ii) his decision to enter into the swap agreement was not affected by whether Wells Fargo was making money.  (SoF at ¶¶ 56-57.)  Moreover, whether the bank owned the swap operations and whether the swap was traded on the open market had nothing to

---

[5] Although never alleged in the Counterclaim, during his deposition Sharma claimed that he relied upon statements that interest rates could go as high as 18 percent.  (SoF at ¶ 53.)

do with Sharma's decision to enter into the Swap Agreement.  (SoF at ¶ 58) ("[w]hether it was traded on the open market, et cetera, are secondary issues. . . . whether I cared about the bank or I cared whether it went on the open market, are issues that is not something where I care or not. . . . I wasn't worried about it.")

Sharma also testified that the only reasons why he entered into the swap agreement were: (1) an alleged statement by Charles Calvin that "interest rates could go higher and could go as high as 18 percent," (2) an alleged statement by Calvin that Sharma "could pre pay it or dissolve the swap agreement at any point," and (3) that Sharma "trust[ed] the bank" and Calvin.  (SoF at ¶¶ 59-60.)  Thus, Sharma cannot establish justifiable reliance upon representations that he has admitted he did not rely upon.  *See Beebe v. Compaq Computer Corp.,* 940 S.W.2d 304, 306 (Tex. App. 1997) (affirming summary judgment because appellant admitted in his deposition testimony that he did not rely on the alleged misrepresentations).

For the same reason, these alleged misrepresentations are immaterial because they did not influence Sharma's decision to enter into the Swap Agreement.  (SoF at ¶¶ 54-60); *see also Manges v. Astra Bar, Inc.,* 596 S.W.2d 605, 611 (Tex. App. 1980)  (In order to show materiality, proof must be made that the misrepresentation induced the complaining party to act.); *Beebe*, 940 S.W.2d at 306 ("A statement or omission is only material, "if there was an appreciable likelihood that it could have significantly affected the investment decisions of a reasonable investor by substantially altering the information available to him in deciding whether to invest.")

**2.    Sharma's Alleged Reliance upon Prior Oral Statements that Are Contradicted by the Express Terms of the Swap Agreement Is Not Justified as a Matter of Law**

Sharma alleges that he relied upon a statement by Calvin that "[t]he swap could be unwound at any time without any charge to Dr. Sharma."  (Counterclaim at ¶ 5.)  This claim, however, is insufficient to support a claim for fraud or negligent misrepresentation because the

alleged misrepresentation is directly contradicted by the express terms of the Swap Agreement, which is a fully-integrated agreement with a merger clause that provides: "This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communications an prior writings with respect thereto."  (Jackson Decl., Ex. E at 12); *see also Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 258 (Tex. App. 2006) (where a contract is negotiated at arms-length by persons represented by counsel, a merger clause is enforceable and negates reliance on any alleged oral statements).

Indeed, the express terms of the Swap Agreement make clear that Sharma is <u>not</u> permitted to unwind the Swap Agreement at any time without any charge to Sharma.  (SoF at ¶¶ 69-74)  Thus, Sharma's purported reliance on this alleged misrepresentation cannot be reasonable or justifiable as a matter of law.  *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854, 858 (Tex. App. 2003) (affirming trial court's summary judgment on fraud claim because "reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law"); *see also Biosilk Spa, L.P. v. HG Shopping Centers, L.P.*, No. 14-06-00986-CV, 2008 WL 1991738, at *3 (Tex. App. May 8, 2008) (affirming summary judgment where evidence negated the element of reasonable reliance because the contract unambiguously disclaimed reliance on any representations, oral or otherwise, not contained in the lease).

In *DRC Parts*, the Texas Court of Appeals explained:

> One of the elements of a fraud claim is that the plaintiff actually and justifiably relied on the misrepresentation to suffer injury. . . . A party's exercise of a right under the written contract, which is contrary to the oral agreement, would subject that party to a fraudulent inducement claim based on the oral agreement. In that event, however, the party who entered into the written contract while relying on a contrary oral agreement would have thereby itself entered into the written contract with an intent not to perform it. Thus, in order to show its reliance on the oral agreement to sustain its own fraudulent inducement claim, that party would necessarily prove that it was guilty of fraudulent inducement as well.

The essential issue, then, is not whether that party's evidence of the contrary oral agreement is admissible or sufficient to prove that agreement, but instead whether the law will deem such reliance to be justified and thereby favor that party to the detriment of the other contracting party, which has at least declared its intent in the contract and sought to abide by its terms.  Because such an approach would defeat the ability of written contracts to provide certainty and avoid dispute, the prevailing rule, recited above, is instead that <u>a party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract</u>.

(*Id.* at 858-59) (emphasis added).

Moreover, "a party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party."  *See, e.g., DeClaire v. G&B McIntosh Family Ltd. P'Ship*, 260 S.W.3d 34, 46 (Tex. App. 2008) (collecting cases).  In *DeClaire*, the plaintiff claimed that he relied upon prior oral representations that were contradicted by the express terms of a promissory note.  *Id*.  The undisputed evidence showed that the plaintiff did not read the note before signing it and that, although plaintiff provided the promissory note to his financial advisor, his financial advisor also claimed that he did not read the promissory note.  *Id.* at 47-48.  Later, when plaintiff attempted to enforce the promissory note, he discovered that it included the language that was contrary to the prior oral representation.  *Id.* at 47.  After the trial court found that plaintiff had established a claim for fraud, the appellate court reversed, holding that as a matter of law the plaintiff could not rely upon a prior oral representations that contradicted the terms of the parties' agreement.  *Id.* at 48.

Like the plaintiff in *DeClaire*, Sharma attempts to rely upon an alleged prior oral representation concerning his termination rights that is directly contradicted by the terms of the

Swap Agreement.[6]  (Counterclaim at ¶ 5(d); SoF at ¶¶ 69-74.)  There are no provisions in the

Swap Agreement or the Swap Transaction Confirmations that permit Sharma to terminate the

Swap Agreement unilaterally at any time without or without any cost to Sharma.  (SoF at ¶¶ 72-

74.)  To the contrary, the Swap Agreement provides that in the event of an early termination of

the Swap Agreement, Sharma would be required to pay Wells Fargo an amount that Wells Fargo

"reasonably determines in good faith to be its total losses and costs (or gain, in which case

expressed as a negative number) in connection with [the Swap] Agreement."  (SoF at ¶ 69-71.)

       Thus, as a matter of law, Sharma could not rely upon any representation that the Swap

Agreement could be terminated at any time without cost because such an oral statement, if made,

would contradict the express terms of the Swap Agreement.  *See DRC Parts*, 112 S.W.3d 854,

856, 858-59 (Tex. App. 2003 (holding that reliance on both pre- and post-contractual oral

representations, directly contradicted by express terms of contract, are not justified as matter of

law).  Moreover, the Swap Agreement contains a merger clause and a risk disclosure with

extensive cautionary language.  (SoF at ¶¶ 63-66.)  Each party also explicitly pledged that "[i]t is

not relying on any communication (written or oral) of the other party as investment advice or as

a recommendation to enter into that Transaction."  (SoF at ¶ 68; *see also* SoF at ¶ 75.)  The

merger clause coupled with the risk disclosure and the non-reliance disclaimer make any alleged

reliance by Sharma upon prior contradictory oral statements unreasonable and unjustified as a

matter of law.  *See Playboy Enterprises*, 202 S.W.3d at 258 (dismissing fraud claim based upon

---

[6] Additionally, although Sharma tries to escape the terms of the Swap Agreement by claiming
that he never read the Swap Agreement, discovery has shown that (i) Sharma instructed Ms.
McAbee to send the Swap Agreement to his attorney, Mark Hodges, (ii) Sharma had his attorney
review the Swap Agreement, and (iii) Sharma's attorney called Calvin about the Swap
Agreement.  (SoF at ¶¶ 77-86.)  He cannot escape the terms of the Swap Agreement simply by
claiming that he chose not to read the terms before signing.  *See DeClaire*, 260 S.W.3d at 46
(plaintiff could not rely on prior oral statement despite his failure to read the promissory note).

merger clause); *Airborne Freight Corp. v. C.R. Lee Enters., Inc.*, 847 S.W.2d 289, 297 (Tex. App. 1992) (finding that written contract containing ample cautionary language precluded exclusive reliance by reasonable businessperson on verbal statements contradicting written agreement); *Fair Isaac Corp. v. Tex. Mut. Ins. Co.*, No. H-05-3007, 2006 WL 2022894 at *2 (S.D. Tex. July 17, 2006) (where parties are represented by attorneys, the parties disclaim reliance on the other party, and the agreement contains a merger clause, a party cannot establish reliance as a matter of law).[7]

> **3.   Sharma could not reasonably or justifiably have relied upon any prediction of future interest rates**

Although not alleged in the Counterclaim, Sharma testified that he relied upon statements by Wells Fargo representatives that interest rates "could" go as high as 18 percent.  (SoF at ¶ 53.) Like the other alleged misrepresentations, this claim also fails as a matter of law because an expression of opinion, especially about unknowable future events, cannot support an action for fraud or negligent misrepresentation.  *See Westcap Enterprises v. City Colleges of Chicago*, 230 F.3d 717, 727 (5th Cir. 2000) (affirming dismissal of securities fraud claim because no one can predict movement of interest rates "with any degree of certainty, and that expressions in this respect are only opinions"); *Transport Ins. Co. v. Faircloth*, 898 S.W.2d 269, 276 (Tex. 1995) (affirming dismissal of common law fraud claim based upon statements concerning future monetary value because "a pure expression of opinion will not support an action for fraud").

---

[7] Moreover, because (i) Sharma was a sophisticated investor with a net worth in excess of $20 million; (ii) Sharma had access to business staff, a stockbroker, multiple financial institutions, and several attorneys; (iii) Sharma consulted his attorney concerning the Swap Agreement; (iv) the transaction was an arms-length transaction; and (v) the disclaimers and risk disclosures encompass the alleged misrepresentation (SoF at ¶¶ 2-13, 51, 63-68, 75-86, 87-91); the merger clause, non-reliance provisions, and other disclaimers are enforceable.  *See Playboy Enterprises*, 202 S.W.3d at 258.

In *Westcap Enterprises*, 230 F.3d at 727, the misrepresentations made were predicated upon an alleged representation about the movement of interest rates.  The Court concluded that the statements may have been high-pressure sales tactics, but they did not amount to material misrepresentations because they were opinions, not statements of fact.  *Id.*  The Court made it clear that regardless of whether a person implies that he had special knowledge as to the movement of interest rates, a purchaser "reasonably can be expected to have known that no one can predict such movement [of interest rates] with any degree of certainty, and that expressions in this respect are only [non-actionable] opinions."  *Id.* at 727-28.

Here, the alleged statement concerning interest rates was unquestionably a non-actionable opinion.  First, the statement that "interest rates <u>could</u> go up to 18 percent" is, on its face, clearly a statement of opinion and not one of fact.  (SoF at ¶ 53.)  Second, Sharma was provided with a 20-year history (from 1987-2006) of LIBOR interest rates, which showed a high of 10 percent in 1989 and a low of 1 percent in 2004.  (SoF at ¶ 45; Jackson Decl. Exs. N-O.)  Third, Sharma has admitted that he knew "that interest rates go up and they come down, they go up and they come down, and that there are cycles."  (SoF at ¶ 6.)  Thus, as a matter of law, Sharma could not justifiably have relied upon the alleged statement concerning future interest rates.  *See Westcap Enterprises*, 230 F.3d at 727-28; *Sergeant Oil & Gas Co., Inc. v. National Maintenance & Repair, Inc.*, 861 F. Supp. 1351, 1360 (S.D. Tex. 1994) ("Negligent misrepresentation does not occur when a defendant simply makes a guess as to a future unknown event."); *Duperier v. Texas State Bank*, 28 S.W.3d 740, 749 (Tex. App. 2000) (statements that certain notes were a safe and suitable investment were held to be opinions because they were an attempt to compare the notes to the salesman's knowledge of the bank's past investments).[8]

---

[8] Although some courts have noted very narrow exceptions to the rule that statements of opinion

**B.      Sharma Cannot Establish Proximate Causation**

Summary judgment is also proper because Sharma cannot establish, as required under both Texas and New York law, that Wells Fargo's statements were the proximate cause of his injuries.  *See Larsen v. Carlene Langford & Assocs.*, 41 S.W.3d 245, 250 (Tex. App. 2001) (proximate cause is element of claim for negligent misrepresentation and fraud); *Revak*, 18 F.3d at 89 -90 ("The requisite causation is established only where the loss complained of is a direct result of the defendant's wrongful actions and independent of other causes.").  In order to establish that the alleged representations were the proximate cause of his loss, Sharma must establish that the representations were the "cause-in-fact" of his loss.  *See Columbia Med. Ctr. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008).  Cause-in-fact only exists if the defendant's act or omission was "a substantial factor in bringing about the injuries, and without it, the harm would not have occurred."  *Id.* at 799.  The Texas Supreme Court has held that damages are not recoverable if they "were simply part of the risk" associated with an investment.  *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997).  In *Arthur Anderson*, emphasizing the need for a causal link between the alleged tortious conduct and the damages sought, the court stated:

> Without this limitation, an investor could shift the entire risk of an investment to a defendant who made a misrepresentation, even if the loss were unrelated to the misrepresentation. The basis of a misrepresentation claim is that the defendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known.  But to allow the plaintiff to transfer the entire risk of loss associated with his investment, even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant, would unfairly transform the defendant into an insurer of the plaintiff's entire investment.

Here, Sharma's alleged losses were caused by an unprecedented drop in interest rates relating to the current financial crisis.  The risk that interest rates could decline after he entered

are not actionable, none of the exceptions apply to the facts in this case.

into the Swap Agreement was "a risk created by the market, rather than any alleged misrepresentation by" Wells Fargo.  *Putnam, LLC*, 2009 WL 2059425, at *6 (affirming summary judgment on dismissal of certain damages claims because the market risk of obtaining returns from investments was a risk created by the market not any alleged misrepresentations concerning market timing).

In the present case, the damages sought by Sharma represent a classic case of loss that was "simply part of the risk" associated with the investment.  *See Arthur Andersen*, 945 S.W.2d at 817.  Sharma accepted a risk that the interest rates would decline, just as he accepted the benefit of protection against the risk that interest rates would rise.  Moreover, not only did Sharma understand that interest rates go up and down, but he also received a historical LIBOR interest rate chart showing the historical changes in LIBOR interest rates over the past 20 years. (SoF at ¶ 6, 45; Jackson Decl. Exs. N-O.)  Thus, to transfer the risk of loss to Wells Fargo in contravention of the Swap Agreement -- even though Sharma knowingly accepted that interest rates would change -- is not permitted under the law.  *See Arthur Andersen*, 945 S.W.2d at 817.

With respect to the first three alleged misrepresentations -- concerning whether Wells Fargo or Calvin were making any money from the transactions, whether Wells Fargo would execute the swap transaction in the open market, and whether Wells Fargo owned the swap operation -- they were not the cause-in-fact of Sharma's loss because Sharma would have entered into the Swap Agreement even if these alleged statements had not been made.  (SoF at ¶¶ 54-60.) Likewise, the representations had nothing to do with Sharma's ability to terminate the Swap Agreement or the financial crisis that led to the unprecedented low-interest environment.  Thus, these allegations cannot form the basis of a fraud or misrepresentation claim because Sharma's losses are "unrelated to the misrepresentation[s]."  *See Arthur Anderson.*, 945 S.W.2d at 817.

Nor could a prediction that interest rates "could" go to 18 percent be the cause-in-fact of

18

Sharma's loss.  Not only was the alleged prediction merely an opinion, but Sharma's loss was caused by LIBOR rates falling below one percent as a result of the economic crisis, not because interest rates did not go to 18 percent.  If such a prediction were sufficient to show proximate causation, Sharma would be able to claim damages equal to the difference between the current value of the Swap Agreement at 7.15 percent and the enormous value that the Swap Agreement would have if interest rates had risen to 18 percent.  This would perversely convert the Swap Agreement from a hedging transaction into a guaranteed windfall to Sharma.  Clearly, an alleged prediction of future interest rates was not the proximate cause of Sharma's loss.  *See Putnam, LLC*, 2009 WL 2059425, at *6 (stating that conduct does not satisfy cause-in-fact component of proximate cause if it merely furnishes condition that makes injury possible) (citation omitted).

Finally, as to Sharma's allegation concerning his termination rights, the cause-in-fact of Sharma's loss -- resulting from his inability to unwind the Swap Agreement at no cost -- was his failure, and the failure of his attorney, to ensure that the terms in the Swap Agreement reflected the agreement that Sharma claims he believed the parties had reached (SoF at ¶¶ 76-91).  *See DRC Parts*, 112 S.W.3d at 858 ("a party who enters into a written contract while relying on a contrary oral agreement does so at its peril and is not rewarded with a claim for fraudulent inducement when the other party seeks to invoke its rights under the contract").  Given that Sharma's "losses" are the result of the risk he accepted -- that interest rates would rise or fall -- and the statements were not a substantial factor in causing interest rates to fall, Sharma cannot meet the essential element of causation necessary to prove fraud or negligent misrepresentation.

## II.   SUMMARY JUDGMENT SHOULD BE GRANTED ON SHARMA'S GOOD FAITH AND FAIR DEALING CLAIM

For his third and final counterclaim, Sharma alleges that Wells Fargo violated its purported duty of good faith and fair dealing.  (Counterclaim at ¶ 14.)  However, a duty of good

faith and fair dealing only arises under Texas law in two discrete circumstances: (1) where the contract expressly states that the parties owe one another a duty to act in good faith and to deal fairly, and (2) where a "special relationship" exists between the contracting parties. *See Lovell v. Western Nat'l Life Ins. Co.*, 754 S.W.2d 298, 302 (Tex. App. 1988) (finding no special relationship, therefore no duty of good faith and fair dealing).

Here, because there is no express contractual duty of good faith (Jackson Decl, Ex. E), Sharma is left to argue that there was a special relationship based on unequal bargaining power between the parties and because he claims to have "trusted" Wells Fargo. (Counterclaim at ¶ 14.) The claim falls short, however, because (i) Sharma's subjective trust in Wells Fargo is insufficient to give rise to a duty of good faith and fair dealing; (ii) discovery has demonstrated that the parties have a customary bank/customer relationship; and (iii) the bargaining power between the parties, to the extent it was unequal at all, was not sufficiently out of balance to give rise to a special relationship with its attendant duties. *See Formosa Plastics Corp., USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 52 (Tex. 1998) (holding that a special relationship does not exist in ordinary commercial transactions).

A.    **Sharma's Banking Relationship With Wells Fargo Did Not Give Rise To a Special Relationship**

Texas law does not imply a covenant of good faith and fair dealing between the parties to every contract. *See FDIC v. Coleman*, 795 S.W.2d 706, 708-09 (Tex. 1990) (holding that the normal relationship of debtor and creditor is not sufficiently special to impose a duty of good faith and fair dealing). On rare occasions, Texas courts have recognized an implied duty or covenant of good faith and fair dealing "but only in special relationships marked by shared trust or an imbalance in bargaining power." *Id.* at 708-09.  Cases recognizing such a duty have been limited to those involving quasi-fiduciary relationships and Texas courts do not generally

20

recognize such a duty "in contracts outside of the insurance context or the public sector."  *Klein v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App. 1994).[9]

Moreover, under Texas law, the normal relationship between a bank and its customers does not create a special relationship. *See Wil-Roye Inv. Co. II v. Washington Mutual Bank, N.A.*, 142 S.W.3D 393, 410 (Tex. App. 2004) (affirming summary judgment on good faith claim between bank and its customers); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App. 1996) (same); *Manufacturers Hanover Trust Co. v. Kingston Investors Corp.*, 819 S.W.2d 607, 610 (Tex. App. 1991) (same).  Likewise, the relationship between a borrower and lender is not a special relationship.  *See D/FW Wheatland Inv., L.P. v. Lehman Bros. Holdings, Inc.*, No. 3-00-CV-2120-BD, 2001 WL 1445950, at * 4 (N.D. Tex. Nov. 13, 2001) (rejecting good faith claim between borrower and lender); *FDIC*, 795 S.W.2d at 708-09 (the relationship of debtor and creditor is not sufficiently special to impose a duty of good faith upon its parties).

Here, the undisputed evidence demonstrates that Sharma and Wells Fargo have nothing more than an ordinary banking or lender-borrower relationship.  (SoF at ¶¶ 14-21, 24-25.)  During the past ten years, Sharma never met with any Wells Fargo representatives for reasons unrelated to financial matters, other than Sharma's attendance at a few Wells Fargo events where other Wells Fargo customers were also present, and was never treated differently than any of the

---

[9] In *Arnold v. Nat'l County Mut. Fire Ins. Co.*, 725 S.W.2d 165, 167 (Tex. 1987), the Texas Supreme Court recognized that in an insurer/insured, "a special relationship arises out of the parties' unequal bargaining power and the nature of the insurance contracts which would allow for unscrupulous insurers to take advantage of their insureds' misfortunes in bargaining for settlement or resolution of claims."  However, "this special relationship is 'to be imposed only in certain narrowly limited circumstances.'"  *GTE Mobilnet of S. Tex. Ltd. P'ship v. Telecell Cellular, Inc.*, 955 S.W.2d 286, 295 (Tex. App. 1997) (quotation omitted).  Moreover, "[a]lthough often urged to do so, the [Texas] Supreme Court has hesitated to extend the duty of good faith and fair dealing to other contexts beyond the special relationship between an insurance company and its insured."  *Id.*

other Wells Fargo banking customers.  (SoF at ¶¶ 16-21.)  The parties have dealt at arm's-length in their contractual relations as evidenced by Sharma's use of attorneys to review his contracts and to protect his contractual rights.  (SoF at ¶¶ 24-25, 76-86.)  Moreover, the contractual relationship in existence at the time of the alleged representations[10] was governed by the Construction Loan Agreement, which expressly provided: "The relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender . . ."  (SoF at ¶ 24.)  Thus, Sharma cannot establish a sufficiently "special relationship" to support a good faith and fair dealing claim.

### B.    Sharma's Subjective "Trust" in Wells Fargo Did Not Create a Special Relationship

Sharma also alleges that a special relationship was created because he "trusted" Wells Fargo and Calvin.  (Counterclaim at ¶ 14.)  However, subjective trust does not create a special relationship for the law to imply a duty of good faith and fair dealing.  *See Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594-95 (Tex. 1992) (subjective trust does not create a special relationship), *superseded by statute on other grounds as stated in Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225-26 (Tex. 2002).[11]  Moreover, Sharma's "subjective trust" is also factually insufficient because, as discussed above, the undisputed facts demonstrate that Sharma and Wells Fargo had an arm's-length business

---

[10] A contractual relationship must exist between the parties to create a duty of good faith and fair dealing under Texas law. *See Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 441 (Tex. App. 1998) (a claim for breach of the duty of good faith and fair dealing is a tort action that *arises from* an underlying contract).

[11] *See also Frazier v. Frontier State Bank*, No. 04-98-00384-CV, 1999 WL 125441, at *2 (Tex. App. March 10, 1999) (not designated for publication); *W&K Associates, Ltd. v. Mesa Operating Ltd. Partnership*, No. 07-96-0007-CV, 1996 WL 636487, at * 12 (Tex. App. Nov. 4, 1996) (affirming trial court finding that there was no degree of trust beyond that of an ordinary banking relationship, therefore, nothing upon which to base a contractually created duty of good faith and fair dealing) (not designated for publication).

relationship.  (SoF at ¶¶ 1-25, 76-86.)  Thus, Sharma's claim of subjective trust is insufficient to support an implied duty of good faith between the parties.

### C.   The Parties' Bargaining Power Was Not Sufficiently Unequal to Create a Special Relationship

Absent a fiduciary duty -- which does not exist here[12] -- in order to establish a special relationship, Sharma must show an imbalance of bargaining power.  *See Bank One, Texas, N.A. v. Stewart*, 967 S.W.2d 419, 441 (Tex. App. 1998).  When a special relationship between a borrower and lender has been found, it has rested on factors such as "excessive control over, or influence in, the borrower's business activities."  *Wil-Roye*, 142 S.W.3D at 410 (citing *Farah v. Mafridge & Kormanik, P.C.*, 927 S.W.2d 663, 675 (Tex. App. 1996)).

The undisputed facts here demonstrate that the parties did not and do not have sufficiently unequal bargaining power to create a special relationship.  (SoF at ¶¶ 1-25, 76-86.) For example, in *Wil-Roye Inv. Co.*, 142 S.W.3D at 410, appellants sought to challenge the trial court's dismissal of their good faith and fair dealing claim by pointing to evidence that they were bank customers, had substantial deposits in the bank, were shareholders in the bank, and had often sought the bank's advice on various matters in support of their good faith and fair dealing claim.  *Id.*  In affirming the trial court's decision, the appellate court held that "these facts do not demonstrate that [the bank] had excessive control or influence in Appellants' business."  *Id.*

Wells Fargo has even less control over Sharma than the bank at issue in *Wil-Roye*.  In fact, under the Construction Loan Agreement -- which was negotiated by Sharma's attorney and which is the contractual relationship to which the good faith claim would adhere because there

---

[12] The Fifth Circuit has made it clear that under Texas law, the relationship between a borrower and lender is not one that gives rise to a fiduciary relationship.  *See K3C Inc. v. Bank of America*, 204 Fed. Appx. 455, 460-61 (5th Cir. 2006).

was no contractual relationship under the Swap Agreement at the time of the alleged representations -- Sharma acknowledged that he "is not in a significantly disparate bargaining position."  Moreover, Sharma (i) is an experienced and "savvy" real estate developer with a net worth in excess of $20 million; (ii) conducts banking activities at three different banks; and (iii) has access to and uses the services of several attorneys, his business staff, including a Certified Public Accountant with an MBA, and a stockbroker.[13]  (SoF at ¶¶ 2-13, 51.)  Moreover, Sharma's reliance upon his own attorney (SoF at ¶¶ 77-86), also refutes any allegations that there was unequal bargaining power in the parties' contractual relationships that could give rise to a duty of good faith and fair dealing.  As Sharma explained during his deposition, he is the "decision-maker" with respect to business decisions, not Wells Fargo.  (SoF at ¶ 67.)  Thus, summary judgment must be granted dismissing Sharma's good faith and fair dealing claim.

## III.   SUMMARY JUDGMENT SHOULD BE GRANTED ON WELLS FARGO'S DECLARATORY JUDGMENT CLAIM

Wells Fargo seeks a declaratory judgment that "(i) the Swap Agreement is valid and enforceable by Wells Fargo against Dr. Sharma, (ii) Dr. Sharma lacks the right to rescind or terminate the Swap Agreement, and (iii) Wells Fargo has no obligation to return or refund the amounts paid by Dr. Sharma pursuant to the terms of the Swap Agreement."  (Compl. at ¶ 41.)

Under New York law, a declaratory judgment is appropriate "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue."[14] *Continental Cas.*

---

[13] Like the defendant in *Bank One*, Sharma is a "successful, well-educated, and experienced businessman with an enterprise in the field of real estate financing." *Bank One*, 967 S.W.2d at 443 (affirming dismissal on breach of good faith claim between debtor and creditor).

[14] New York law applies to the validity and enforceability of the Swap Agreement because the Swap Agreement expressly provides that it "will be governed by and construed in accordance with the laws of the State of New York without reference to choice of law doctrine."  *See* July 28, 2009 Memorandum Order at 3 [Docket Doc. 48].

*Co. v. Coastal Savings Bank*, 977 F.2d 734, 737 (2d Cir. 1992) (citation omitted).  Moreover, a declaratory judgment is a proper method to settle "justiciable disputes as to contract rights and obligations." *Kalisch-Jarcho, Inc. v. City of N.Y.*, 72 N.Y.2d 727, 731, 734 (1988).

Because, as discussed in detail above, Sharma cannot make out a claim for rescission of the Swap Agreement or the Swap Transaction Confirmations, the Court should grant Wells Fargo a declaratory judgment providing that (i) the Swap Agreement and the Swap Transaction Confirmations are valid and enforceable against Sharma, (ii) Sharma is not entitled to rescind or terminate the Swap Agreement, and (iii) Wells Fargo has no obligation to return or refund the amounts paid by Dr. Sharma.  *See, e.g., Dunkin' Donuts Inc. v. Barr Donut, LLC*, 242 F. Supp. 2d 296, 310-311 (S.D.N.Y. 2003) (granting summary judgment to plaintiff on its declaratory judgment claim and enforcing the terms of the parties' agreement).

## CONCLUSION

For all of the foregoing reasons, Wells Fargo respectfully requests that the Court grant its motion for summary judgment dismissing the Counterclaim in its entirety, issuing a declaration that the Swap Agreement and the Swap Transaction Confirmations are valid and enforceable agreements, and granting such other and further relief as the Court may deem just and proper.

Dated: New York, New York
  July 31, 2009

         SIDLEY AUSTIN LLP

By: _____
         Andrew W. Stern (astern@sidley.com)
         Martin B. Jackson (mjackson@sidley.com)
         Marissa Alter-Nelson (malternelson@sidley.com)
         787 Seventh Avenue
         New York, New York  10019
         Tel: (212) 839-5300
         Fax: (212) 839-5599

         *Attorneys for Plaintiff Wells Fargo Bank, N.A.*

NY1 7031284v.7